OTTO LE ROY FITZSIMONS, petitioner-respondent,

*v.*

MARGUERITE B. FITZSIMONS, defendant-respondent.   No. 41.

OTTO LE ROY FITZSIMONS, petitioner-respondent,

*v.*

MARGUERITE B. FITZSIMONS, defendant-appellant.   No. 65.

[Submitted July 3d, 1922.   Decided November 20th, 1922.]

On petition for absolute divorce brought by a husband on the ground of adultery and answer by the wife denying the adultery, alleging condonation, and setting up a cross-petition for divorce *a mensa et thoro* on the ground of extreme cruelty, the evidence considered and the facts found—*Held*, to show adultery on the part of the wife but not to show extreme cruelty on the part of the husband.

On appeal from a decree of the court of chancery dismissing petition for divorce and also appeal from the same decree dismissing cross-petition.

*Messrs. Cole & Cole* and *Mr. Clarence L. Cole,* for the appellant-respondent, Otto Le Roy Fitzsimons.

*Messrs. Moore & Butler* and *Mr. Robert H. McCarter,* for the respondent-appellant, Marguerite B. Fitzsimons.

The opinion of the court was delivered by

ACKERSON, J.

This is a suit for divorce.   The husband filed a petition praying for a divorce on the ground of adultery, and the

wife filed an answer denying the adultery, setting up condonation and a cross-petition for divorce *a mensa et thoro* because of the extreme cruelty of the husband. The learned vice-chancellor, after hearing the testimony, dismissed the husband's petition and also dismissed the wife's cross-petition. Both parties have appealed.

The husband's case rests upon two charges of adultery, one in August, 1920, with a man whom we shall refer to as "G," and the other in April, 1921, with a man whom we shall call "K," at the Normandie hotel in Philadelphia.

The proofs show a remarkable intimacy between the defendant and "G," a married man, living apart from his wife, while defendant was visiting at a country place called Monroe. She herself admitted on the witness-stand that she allowed him to love her and kiss her and be very affectionate towards her; that she frequently telephoned to him and that they frequently went riding alone together, and that after her return to her home at Atlantic City she corresponded with him and received many letters from him, addressed to and received by her at an address other than where she resided with her husband, two of which letters were found by her husband under her pillow and were of an extremely affectionate character, referred to previous clandestine meetings with "G" and advised that his letters be destroyed, and otherwise indicated that illicit relations existed between "G" and the defendant. Her explanation of her intimacy with "G" is that she was a friend of his wife's and that he and his wife had become estranged and were not living together, and defendant thought that by being kind to him she could bring them together again. She admits, however, that she never saw "G's" wife during this period and never spoke to her about the subject. Just how she expected to effect a reconciliation by winning the affection of the husband does not appear, and it seems to us that such conduct is hardly consonant with her protestations of innocent intentions.

Shortly after her visit to Monroe the defendant's physician discovered that she had a venereal disease. She admits it, but says that she contracted it by wearing undergarments

belonging to her sister, who, she says, contracted the disease in the early part of the same year. This sister, however, was not produced as a witness, nor was her deposition taken, although it was admitted that she was living in Baltimore, and her absence was not otherwise explained, nor is any other evidence produced in support of the defendant's claim.

Coming now to the second charge of adultery, we find the uncontroverted facts to be, that without the knowledge of her husband the defendant and her sister left Atlantic City on the afternoon of April 22d, 1921, with two young men, whom defendant had known for only a few weeks, traveled with them to Philadelphia by automobile, had dinner, with liquor, at a restaurant, where all four stayed until nearly midnight, when they went from this restaurant to the Hotel Normandie, where the two men and the two women were registered by the men, as husbands and wives, and two rooms were assigned to them upon that theory by the hotel clerk (the defendant and her escort being registered as "Mr. and Mrs. K."); that the suit cases of the men (the women had none) were placed in the separate rooms and that they all stayed all night at this hotel and had breakfast together the next morning in a private room, after which they all left the hotel together.

It would seem to require unbounded faith and considerable ingenuity to evolve from the foregoing facts a situation which would be consistent with the defendant's innocence of the charge laid against her; but she says in explanation of her conduct on this occasion that she took this trip to Philadelphia solely for the purpose of preventing her sister from becoming intoxicated, a social error which sometimes got the better of her, intending to bring her back to their home in Atlantic City by train the same evening; that on their arrival at Philadelphia, at about six o'clock in the evening, they proceeded first to the Normandie hotel to see a lady friend of the defendant's; but finding that she did not reside there the defendant and her sister went alone to the home of a married woman friend of theirs to fix themselves up after the automobile ride, and where they remained for

about two hours, away from the two men; but later joined them for dinner at a restaurant, where the sister and the two men had liquor to drink and all became intoxicated except the defendant, and where they all remained until midnight; and that after they went to the hotel she got her sister, who was still intoxicated, into a room by herself, and the defendant sat up in an adjoining sitting-room alone all night and never went near her sister again until morning; that Mr. "K" slept in the other bedroom and she does not know where the other man slept, and that she did not know that she had been registered as "K's" wife until the next morning. Neither of the men were produced before the vice-chancellor; but their depositions were taken in Philadelphia and read at the hearing, in which they both claimed to be intoxicated when they went to the Normandie hotel with the two women, and "K" claiming to have been so intoxicated that he does not remember anything which happened at the hotel the night in question, and the other man does not remember whether he registered or not. On the whole, the statements of these men do not impress us as bearing the ear-marks of truth. If the defendant's intentions were innocent it is hard to understand why she and her sister did not take a train back to Atlantic City during the two hours they were at their friend's home, apart from the two men, or perhaps later in the evening, as it was admitted that there were several trains leaving for Atlantic City during the course of the evening; or why the two women did not spend the night at their friend's home, where they were earlier in the evening; or why they did not insist that the men go to another hotel for the night. We cannot give credence to defendant's version of the Philadelphia trip. The proofs certainly show a desire on the part of the defendant to commit adultery, and abundant opportunity to gratify it, coupled with evidence tending to show the actual commission of the offence. *Story* v. *Story, 91 N. J. Eq. 515.* We find ourselves irresistibly led to the conclusion of defendant's infidelity. Nor has she substantiated her defence of condonation. It is sufficient on this point to remark that she herself admits that she did not

cohabit with her husband after February, 1921, and the Hotel Normandie incident did not occur until April 22d, 1921.

It is possible that we might not reach the conclusion which we have as to the unfaithfulness of the wife if there was only one suspicious circumstance against her; but when there are several, each pointing strongly to infidelity, it extends beyond the realm of coincidence.

We have carefully considered the evidence produced on the part of the wife in support of her cross-petition for divorce *a mensa et thoro* on the ground of extreme cruelty, and we do not think there was sufficient evidence of such charges to justify her cross-petition, and have concluded that the learned vice-chancellor properly dismissed it.

These views lead to a reversal of the decree against the husband and the granting of the prayer of his petition, and to an affirmance of the decree against the wife upon her cross-petition.

No. 41.  Appeal of husband—
*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, GARDNER, ACKERSON, VAN BUSKIRK—11.

No. 65.  Appeal of wife—
*For affirmance* — THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, GARDNER, ACKERSON, VAN BUSKIRK—11.

*For reversal*—None.